**UNITED STATES DISTRICT COURT**
**EASTERN DISTRCIT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,                    CRIMINAL NO. 16-20684

                                             HON. AVERN COHN

vs

D-2 CLIFTON DIVERS,

                    Defendant.
_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES AS TO DEFENDANT CLIFTON DIVERS

The United States of America respectfully submits this Sentencing
Memorandum regarding Clifton Divers, who is scheduled to be sentenced on
August 13, 2018.  For the reasons set forth below, the government recommends a
term of imprisonment of 52 months.

## I.    INTRODUCTION

Defendant Clifton Divers used his 14 years' experience as a Special Agent
with U.S. Immigration and Customs Enforcement- Department of Homeland
Security Investigations (DHS-HSI) to serve no good for his country or for the
immigration system that Divers took an oath to uphold.  Instead of carrying out
his duties with the integrity, honesty and professionalism, as he vowed to do,
Divers would advance only one mission with fervor—attorney Charles Busse's
quest to exploit one of the country's most sensitive immigration benefit

programs, the deferred action program, for their own personal enrichment.

For more than five years, Divers and Busse conspired to fraudulently obtain immigration benefits for a number of Busse's clients.  Among other actions Divers took in furtherance of the conspiracy, Divers knowingly used fabricated information Busse supplied his clients to be used in staged efforts to cooperate in law enforcement investigations with Divers; lied to his fellow law enforcement officers about Busse's involvement; and further employed numerous efforts to conceal his corrupt relationship with Busse.

Over the course of the conspiracy, Divers obtained deferrals of deportation, releases from immigration custody and other immigration benefits for at least four of Busse's clients based on false and fraudulent information.  For this access to someone on the inside, desperate clients paid Busse handsomely. Divers' corrupt behavior was not limited to taking advantage of the broken immigration system and Busse's clients.  In addition to the free legal services Busse provided Divers, Divers also accepted a free laptop computer for agreeing to misuse his position to supply non-public law enforcement information. And once Divers learned his unscrupulous behavior had been uncovered, he would again resort to obstructive conduct to conceal his crimes.

## II.   ARGUMENT

### A.   The Nature and Circumstances of Hamilton's Crimes (18 U.S.C. § 3553(a)(1))

#### 1.  The Deferred Action Program

Individuals subject to a final order of deportation entered in the U.S. immigration system face a near insurmountable barrier.  In laymen's terms, they have reached the end of the road.  There are virtually no legal options available for them to avoid being deported from the United States.

In 2009, Busse identified and exploited one exception to the final orders of deportation, an exception known as the deferred action program.  The program was designed to allow officials to defer the deportation from the United States of an individual who was providing active assistance in investigations into terrorism, corruption, weapons trafficking, drug trafficking or similar offenses.

 Busse exploited the deferred action program by fabricating information on supposed crimes and supposed criminals.  Busse then sold the bogus information to clients to be used as part of staged efforts to 'cooperate' with federal law enforcement.  The scheme was both cunning and nefarious.  For Busse, it was also very, very profitable.

Divers was the official with whom Busse conspired to assist with his devious plan.  But for Divers, Busse would not have been able to exploit the

overtaxed and broken immigration system in need of reform.  Nor would Busse

have been able to make hundreds of thousands of dollars likewise exploiting the

inexperience, trust and desperation of his clients and their families.

### 2. Divers used his Position as a Special Agent to Fraudulently Obtain Immigration Benefits for Busse's Clients

From 2003 through 2015, Divers served as a special agent with United

States Immigration and Customs Enforcement- Homeland Security Investigations.

(PSR ¶ 8).  As such Divers enjoyed top secret clearance, which gave him authority

to review classified materials and entrusted him with the duty to protect the nation

from harm at the highest level of integrity and honesty.   However between 2009

and 2015, Divers would trade those standards and the trust afforded him and

conspire with Busse to fraudulently obtain immigration benefits for a number of

Busse's clients.

Busse provided Divers legal representation at no cost in at least two separate

lawsuits and trust; trust and estate work, and establishing a Michigan corporation

for Divers.  And over the course of three summers, Busse provided Divers then

high school daughter thousands of dollars in cash for allegedly performing clerical

work at his law offices.  Busse paid Divers' daughter in cash because it would

"keep Uncle Sam out" of his affairs. Divers never disclosed these private financial

connections with Busse to the relevant officials at ICE-HSI.

Divers and Busse employed various means to conceal their relationship and their scheme. One manner in which Busse and Divers concealed their arrangement was through the creation of a fictitious individual Divers and Busse they named "Chris," who they referred to when passing along the fabricated information they used to defraud others in furtherance of their goals.

Who is Chris?, Busse's client, LS, a female Albanian national, acting under the direction of Department of Homeland Security- Office of Inspector General (DHS-OIG) asked Busse before a staged meeting with Divers. Busse told LS: "Now there are some final details that, uh, I have to save for today ... this is what I've been told is, the way it will flow best to get you to the stay off deportation is that you made the call to the agent." . . . "The agent's name is Cliff Divers . . . you got his name and number, if it comes up, from Chris." And when LS then asked "Who's Chris?" Busse replied: "You don't need to know that." Busse would then recruit an unwitting lawyer to stand in at LS's meeting with Divers. Although Divers knew Busse represented LS, Busse cautioned LS that his (Busse) name should not come up and . . . "Cliff will guide the conversation" and "regarding the other officer, in the event of any unexpected questions, Cliff will guide it."

  And that's exactly what Cliff did. At the outset of LS's first meeting with Divers, on October 28, 2014, Divers stated: "I got a little bit of the spiel from Chris

. . . "he was telling me about what you know and all that.  LS did not know a Chris. She did not have any personal knowledge of the information Divers claimed to have received from Chris. Nor was she familiar with the lawyer Busse sent with her to meet Divers.  Only Divers and Busse knew Chris. Chris was the imaginary individual Divers and Busse created to conceal their fraudulent acts, Chris appears to have been Busse.

**3.   Divers provided Inaccurate and Misleading Information to Fraudulently Obtain Immigration Benefits for Busse's Clients**

In early 2014 and 2015, DHS-OIG agents used LS to pose as a client of Charles Busse.  In August 2014, when LS' cooperation began, LS was subject to a final order of deportation from the United States.  Prior to August of 2014, LS had used the services of another immigration attorney but that attorney, unlike Charles Busse, had acknowledged there were no legal avenues available for LS to stay off deportation.

However, Busse summoned LS to his office and explained to LS that he had "found a way," for her to avoid being deported.  Before outlining his solution, Busse required LS to turn over her purse and her cellular phone because, as Busse put it, "I'm always a little nervous about recording devices in the room."  And rightly so, because that "way" to avoid being deported that Busse described would be accomplished with help from Divers.  And Busse could not risk having that

information being transmitted to anyone.  Nonetheless, LS recorded this conversations and her subsequent conversations with Busse (and later Divers) because the recording device was neither her phone nor within her purse.

Once those items had been removed from the room, Busse then described the deferred action program for LS.  As Busse put it, the program existed not to stem "illegals crossing and all these Mexicans" but instead to combat "complicated international organizations" such as "terrorist" groups that could obtain U.S. Passports for their members.  As Busse stated, "The United States is afraid of this group because many of the members are English speaking westerners . . . there's a great concern about [those] people."  Busse then explained "[b]ecause it's an important issue, the United States Immigration Service is willing to offer benefits to individuals who are not otherwise eligible if they're able to help with the investigations."

Busse acknowledged that LS herself did not have any such information to provide to law enforcement officials and then stated that he would "educate" LS about criminal activities so she could obtain a deferred action.  Busse continued: "with all of that said, now we have to talk some business. . .[t]his is a fifty-thousand dollar trip.  It's a very, very serious . . . very unique trip."  When LS expressed shock at the amount of that fee, Busse responded "I can share with you that in my career this is a fee of . . . average rate.  Someone paid me last summer,

paid me more."  Busse also proclaimed, "I've been doing this a long time . . . with a lot of success."

Over the weeks that followed, Busse provided LS with printed scripts of information for her to memorize concerning immigration fraud, visa fraud and large scale marijuana trafficking, all of it previously unknown to LS. Busse also took delivery of $25,000 in cash paid to him by LS.  On one occasion, after LS put $20,000 in cash directly in his hands, she asked Busse: "It's gonna keep me here, right?"  To which Mr. Busse replied: "This is money to stay and never have to leave."  Busse told LS that he would use one of his contacts at ICE to obtain a deferred action so that LS would not be deported from the United States. That contact was Divers.  And Busse was able to give LS those assurances because as Busse told LS, "this is a special project that requires some special skills.  There aren't too many people that can do it."

Initially, during LS's several meetings with Busse, Busse suggested that he and LS needed to travel to Chicago to meet with one or more ICE agents as part of LS's staged cooperation. That attempt was facilitated by Divers.  Divers contacted ICE Agent MF in ICE-HSI's Chicago office, over a weekend, and represented that LS had information about an individual engaged in immigration fraud in Chicago. Divers provided Busse's contact information and Agent MF and Busse later had several communications about the alleged information regarding immigration

fraud.  Agent MF also continued to keep Divers abreast of his communications with Busse, later calling Divers, as a "courtesy" to inform him that he looked into the matter and couldn't find anything on an individual by name provided by Busse in early October 2014.

Only after it became clear to Divers and Busse that they would not be able to dupe the Chicago ICE-HSI office into following their false information, Busse and Divers changed their approach to defrauding ICE-HSI in Detroit. By October 9, 2014, Busse made LS aware of the change in the location of the staged cooperation from Chicago to Detroit. Busse told LS "in clearing the record . . . in Chicago, um they weren't able to confirm a couple of details which they needed to confirm. And so, uh, I on my own, gave some consideration to the possibility of . . . perhaps arranging a hearing in Detroit through my contacts here, who actually were the contacts that turned me onto Chicago anyways."

Later in the October 9, 2014 meeting, Busse made another reference to his "contact" in Detroit and told LS: "So I met with him and talked about this information and he said that he would be reviewing it through his office here and that if it was as good as it sounded, which it is, then we might not even have to go to Chicago, we could just do this here."  Busse then cautioned LS "because meetings with, you know, officers of immigration and officers of the government and investigators, a lot of that's very sensitive . . . and as an attorney, I'm a little

reluctant just to even to let you know I know these people.  You know because sometimes they get in trouble because the word on the street . . . "  LS replied "Busse, I am not talking to anybody."

Call record data indicated that 4 calls were placed and 7 texts were sent between Busse and Clifton Divers on October 7, 2014, three days before LS's meeting with Busse where LS and Busse discussed the shift in the plan from Chicago to Detroit.  The same call data also indicated that an additional 4 calls were placed on October 7, 2014 between Busse and Divers.   And on the afternoon of October 10, 2014, when LS met with Busse at his office in Rochester, Michigan, Busse stated at the outset of that meeting: "Um, well okay. We're doing it here. We're doing it in Detroit."  Later in the meeting, Busse explained: "the Detroit people who um, are interested in what's happening here um, have agreed to basically work with Chicago but take, take over going forth allowing us to meet people here."   Busse also informed LS "the new part of the story is that our fellow is also involved in transportation of drugs and so um, some of that moves through Detroit and New York, um, so our story expands a little bit. Telephone call records also confirmed that on October 10, 2014 at 4:41 p.m. a call was placed between Busse and Divers that lasted approximately 7.5 minutes. LS's meeting with Busse on that same day began approximately 40 minutes after that call.

And Busse arranged for LS to meet with his Detroit "contact" at the ICE-HSI in Detroit on October 28, 2014 when "Chris" gave Divers "the spiel." During that meeting, Divers would further confirm his communication with Busse, (aka Chris). Divers told LS, "I got some notes from Chris, that Chris gave me some names and stuff that I'm still running checks on but it sounds really good … Divers would never check any law enforcement databases for the names in the typed script Busse (Chris) had provided LS. That was not required because Divers knew the information was false and never intended to act on it.

Moreover, when LS asked the unwitting attorney Busse sent with LS to meet with Divers, RK, whether he had ever had interviews with Divers, RK would further confirm the Divers-Busse connection. RK stated: " No, I have not. Chuck knows him. Um, my understanding is he's had a lot of work with him." And Divers, knowing that LS was actually represented by Busse, would later falsely tell the officer handling LS's deportation that LS was represented by RK.

Several months after LS's meeting with Divers, Divers obtained deferred action for LS, based on his fraudulent representations and the contrived information provided by Busse. Later, as agents moved in on Divers and Busse, during a search of Busse's office, Busse would suspect LS as "a plant," and remark that he "hoped the investigators would find out there were lots of other attorneys who were bribing this officer."

11

In addition to covering up their crimes and their relationship with the creation of nonexistent Chris, Divers also facilitated other sham cooperation with Busse with several of Busse's other clients.  By the time LS was used to assist in this investigation, years earlier, Divers and Busse had already established their scheme of supplying clients with and using fabricated information in staged efforts to cooperate in law enforcement investigations with Divers and the Detroit office of ICE-HSI. Divers participated in the sham cooperation, knowingly sharing the false information and making misrepresentations to superiors and other law enforcement officers working on deporting Busse's clients.

In June 2009, male Albanian National, KS, retained Busse after Busse quoted him a fee of $30,000.  Records obtained from the Detroit office United States Customs and Immigration Service (USCIS) reveal that, in February of 2010, USCIS made a preliminary determination that KS had committed immigration and visa fraud, which determination was reported to Busse as counsel of record for KS. Telephone call records and calendar records obtained from the search of Busse's offices reveal that Busse then contacted Special Agent Clifton Divers.  After KS paid Busse, Busse's approach to "taking care" of the situation was to direct KS down the route of staged cooperation, by-passing other, legitimate, options that should have been pursued on behalf of his client.  And Divers was there to oblige.

Later in February of 2010, and within a few days of being contacted by Busse, Divers made an unexpected visit to the Detroit office of USCIS and inquired about the possible referral of the KS file for an official criminal investigation.  In response, an USCIS Officer provided Divers with KS's immigration file, along with the files for three related Albanian nationals, expecting that Divers would conduct a follow-up criminal investigation.  No such investigation ever occurred.

KS testified that, in April of 2010, Busse made arrangements for him to meet with Divers at the Detroit offices of ICE-HSI.   KS reported that Divers spent most of that meeting asking about the attorney who represented him before he hired Busse.   Divers did not write up a report on that (or any other) interview with KS.

In October of 2010, the USCIS Officer sent a follow-up inquiry to Divers to ask about the status of the ICE investigation of KS.  Divers responded by telling the Officer that he had found no evidence of fraud involving KS and then stated that KS was "assisting" the Detroit office of ICE-HSI in an ongoing investigation. As a result of that email from Divers, the USCIS Officer closed his inquiry and did not refer KS for any deportation proceedings.

A review of ICE-HSI records confirms that at no time did Divers document KS as an informant.  ICE Detroit Special Agent AY, who was assigned to the same

ICE-HSI group as Divers throughout 2010 and 2011, testified that KS never provided any assistance in any official ICE investigations. And KS, himself, reported he was not providing active assistance to Divers or anyone else at ICE-HSI.

In 2010, Divers also helped Busse obtain deferred actions for two Iraqi national brothers, TM and HM, who had a similar experience with Divers and Busse. On or about December 13, 2010, Divers obtained a one year Deferred Action for both TM and HM. The Deferred Actions were based upon Divers' claim that the brothers were "providing information [on] Criminal Organizations" that were allegedly operating in the Detroit area. In a subsequent official ICE-HSI report, Divers claimed that the brothers were to be used to "infiltrate several organizations" that were "involved in the manufacturing of fraudulent documents." On December 15, 2010, Divers arranged for both brothers to be released from immigration custody.

On January 11, 2011, Divers obtained two unique informant Confidential Informant numbers from the C/I coordinator in the Detroit office. The numbers obtained by Divers were assigned to TM and HM to assist in an official ICE-HSI investigation into document fraud. ICE-HSI Detroit Agent AY, a secondary agent on the brothers' case reported that both brothers had appeared at the ICE-HSI office in Detroit on or about January 10, 2011 and that their attorney, Charles

Busse, was also present at that meeting.  Detroit Agent AY further reported that

TM and HM claimed to know an individual, identified as "Tony," who, allegedly,

sold fabricated identification documents.  Detroit Agent Ay found the version of

events provided by the brothers to be incomplete and not credible.

Detroit Agent AY recalled that, on January 11, 2011, he and another agent

proceeded with directing TM to place a call to "Tony."  That resulting call went to

a voicemail box that was not set up and it appeared to Detroit Agent AY that TM

pretended to be carrying on a conversation with "Tony" when, in fact, there was no

one on the other end of the call with TM.   Agent AY further recalled that when

TM made a second monitored call to "Tony" later on January 11, 2011, under the

supervision of Divers, the resulting conversation appeared to be scripted.

By way of example, Agent AY stated TM had been in custody for over a

year and at the outset of the call with "Tony," TM launched into a discussion about

criminal activity.  Based on his experience, Agent AY found this to be highly

unusual, and also found TM's conversation with "Tony," unusually perfect.  And

even more importantly, Agent AY recalled that while he and several other agents

listened to the call, "Tony's" voice was muffled.  To every other agent in the

room's surprise, the only person who claimed to be able to discern what was

otherwise unintelligible to every other agent in the room was Divers.  Agent AY

also found Divers enthusiasm over the discussion, both highly unusual and unwarranted.

DHS-OIG agents investigating this case would later learn that the phone number TM used to call "Tony" had only been activated by metroPCS cellular phone company the day before TM's call in the name of a fictitious individual at a bogus address. Agents learned that information after recovering the metroPCS subscriber report Divers had concealed in his office and later attempted to shred after being confronted by Agent AY about discrepancies in official ICE documents regarding the Iraqi national brothers.

Divers eventually obtained deferred actions for the Iraqi national brothers and although neither brother provided any significant investigative leads to ICE-HSI, Divers declined to revoke their deferred action for nearly two years.

Divers did not limited his corrupt behavior to his association with Busse.  In September 2015, Divers also accepted a bribe. In a series of text message exchanges between Divers and local business owner JG, between August 13, 2015 and August 24, 2015, Divers agreed to access law enforcement databases for non-public information about an individual and provide that information to JG in exchange for a laptop computer.

And again, Divers demonstrated his propensity to create falsities to conceal his wrongdoing. Text messages on Divers government issued cellular phone and the testimony of JG and his employee, JH confirmed the bribe between Divers and JG.  Approximately one week after Divers took possession of the laptop, DHS-OIG agents seized Divers government issued cellphone.  Realizing his cellphone contained the incriminating text messages with JB, Divers again resorted to what he knew best—deception.

Approximately one week after agents seized his cellphone, Divers contacted JG and requested that JG prepare an invoice for the computer.  JG agreed and also capitulated to Divers demand that the computer be invoiced for $250, after haggling with Divers about the value of the computer and even though JG knew the computer was worth at least $1,000.

## III.  <u>Sentencing Guideline Calculations</u>

"The Guidelines should be the starting point and the initial benchmark in determining a sentence and a district court should begin all proceedings by correctly calculating the applicable Guideline range."  *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) quoting *Gall v. United States*, 128 S.Ct, 596, 601(2007) (internal quotations omitted).

A. **Rule 11 Plea Agreement**

The Rule 11 Plea agreement provides that the parties agree on all sentencing factors except whether increases under USSG §§ 2C1.1(b)(2) and 3C1.1 should apply. In this case, the government takes the position that Divers' guideline level should be increase by six levels pursuant to USSG § 2C1.1(b)(2) because the value of anything obtained by Divers' co-conspirator exceeded $40,000.

1. **Applicability of USSG § 2C1.1(b)(2)**

Section 2C1.1(b)(2) of the United States Sentencing Guidelines provides level increases based on "the value of anything obtained or to be obtained by a public official or others acting *with* a public official." (emphasis added). The level of the increase is based on the level corresponding to the amount of the thing of value as provided in USSG § 2B1.1. USSG 2C1.1(b)(2).

This is a conspiracy case and under the basic agency theories of the law of conspiracy and coconspirator liability espoused in *Pinkerton v. United Stated*, 328 U.S. 640, 646-47, 66 S.Ct. 1180 (1946), Divers is liable for fees Busse collected from the clients who Divers assisted Busse in obtaining immigration benefits based on fraud because those fees were proceeds of the conspiracy collected by Busse in furtherance of the conspiracy. *United States v. Gresser,* 935 F.2d 96, 101 (6th Cir. 1991) ("A conspirator can be held criminally liable for the actions of his co-

conspirators committed during and in furtherance of the conspiracy") (citing

*United States v.Robinson,* 651 F.2d 1188, 1195 (6th Cir. 1981).

As described here, Divers was a coconspirator in this case.  And with his

guilty plea he admitted to being the same. Divers conspired with Busse to defraud

the United States. He actively facilitated and aided Busse's corrupt objectives in

various ways, helping Busse blatantly violate the country's immigration laws.

Besides the fact that it is common knowledge and foreseeable that lawyers would

require payment for their legal services, Divers specifically knew the clients he

assisted Busse in obtaining immigration benefits to which they were not entitled,

paid Busse for his legal representation.

LS told Divers on April 13, 2015, about the "five grand [she] was paying for

the deferred action" that Divers had acquired for her.  And in an attempt to

distance himself from being held accountable for any money Busse, or in fact,

Divers himself received during this criminal endeavor, much like Divers attempts

to do here at sentencing, when LS mentioned money, Divers made several short

unintelligible sounds  and then stated "I'm saying you're not, you didn't  you're

not getting paid for the deferred, you're not paying Busse for the Deferred Action,

he, you're getting paid to help me with this case, with information you're giving

me, you know, right? "  LS responded: " Yes, yes I do that, but I'm supposed to

pay Busse a fee for helping me get the Deferred Action and I was wondering if that

fee for the work permit goes there," to which Divers replied: No, that does not have nothing to do with, that's two separate things, whatever you deal with him with his money that, that's between you and him, that's attorney-client privilege."

It was apparent to LS that LS's reference to money she had paid Busse rattled Divers. And that was confirmed a few days later when Busse summoned LS to his office. At the outset of the meeting, Busse told LS, "The reason why I wanted to see you is that I talked to, uh, Agent Divers . . . there was a phone call, I guess, where you and he had a conversation, um, and I wanted to bring to your attention . . . there are certain things you and he should not be talking about, and that's how much you paid your lawyer." Busse continued: "It puts him in an uncomfortable situation, as if you're purchasing a government benefit, which is not at all what's happened here." Referring to Agent Divers, Busse said "When he told me that this came up, he said, 'what's going on?' you know, he was thinking, 'wait a minute, is the phone being recorded?'" Later in the conversation, LS said of Agent Divers: "But, he's got to understand that, and my perspective was like, okay, he knows a little bit, we're on the same page." Busse responded: "He's a big boy." LS continued: "He's on our side, right?" Busse responded: "He is. He is."

This is an example of the depth of the collusion between Divers and Busse which makes Divers objection here unpersuasive. Divers was squarely in Busse's orbit of corruption and should be held accountable for the proceeds obtained in

carrying out the objects of this conspiracy. Divers advanced, helped and engaged in numerous machinations to conceal his relationship with Busse and achieve the unlawful goals this conspiracy.

His answers to LS's questions not only prove his active participation in this conspiracy, but further shows his efforts to conceal his participation from others. First, Divers told LS that the issue of money was between LS and Busse, "attorney-client privilege," he told LS.   Yet, approximately six months before this discussion, Divers falsely represented to ICE Officer TT, who was in charge of making arrangements to deport LS, that LS's lawyer was "[RK] or something . . . I think it's [RK]."  And all while knowing that LS was actually represented by Busse, and even making the reference to attorney-client privilege, Divers ensured that no one at the ICE-HSI in Detroit learned of this fact while he was working on LS's case.  Approximately one month after this discussion with LS, Divers would cause the replacement of the DHS employment authorization document that Busse's staff "inadvertently" listed Charles Busse as LS's attorney with a version that listed "[RK]," as LS's attorney. This occurred after Divers visibly demonstrated his discomfort with Busse's name being on the employment form when another unwitting ICE agent, Agent PS, who was working with Divers on LS's case, inquired about Busse after seeing his name on the form.  Before LS

could even bring the issue to Busse's attention, Busse would later tell LS that he

"fixed" that problem, which was accomplished with Divers' help.

Second, Divers' unusual behavior in response to even the mention of

payment to one's lawyer and Divers' call to Busse about it later is telling.  As

Busse told LS, Divers was on their side; they were partners; he'll always protect

you.  And in another attempt at concealment, a few weeks later, when Divers

thought LS had recorded him, Divers reported to a supervising officer that his wife

had access to thousands of dollars in unexplained funds which could not be

accounted for through her legitimate employment, demonstrating that he was

beholden to no one but Busse.

All of this, in addition to the deceit and fraud in which Divers engaged to

advance Busse's unlawful objectives, in violation of immigration laws and in

breach of his code of ethics and conduct squarely puts Divers in the thick of this

conspiracy and those acts of Busse in furtherance of the conspiracy should be

attributed to Divers. Divers' claim that he was not aware of the amount of the fees

Busse imposed on his clients also does not absolve him.  Divers is liable for the

acts of his coconspirator, even those acts to which he might not be aware.  "A

conspirator need not have personally performed the deed for which he is being held

liable." *Gresser*, 935 F.2d at 101; *United States v. Schultz*, 855 F.2d 1217, 1220

(6th Cir. 1988) (relying on *Pinkerton* finding it is not necessary that the

government prove that the defendant was aware of each act of his coconspirators in furtherance of the conspiracy).

Through the cunning and nefarious scheme used in this case, Busse made hundreds of thousands of dollars.  Busse charged his clients fees of up to $50,000 to obtain such immigration benefits by fraud. Since Divers shared in achieving the goals of the conspiracy he must also share in the punishment associated with the tens of thousands of dollars Busse collected from his clients in furtherance of his conspiracy.  A six level increase to Divers guideline level pursuant to USSG § 2C1.1(b)(2) is appropriate based on the facts of this case.

### 2.  Applicability of USSG § 3C1.1

Contrary to Divers' position otherwise, Divers presents a textbook example of obstructing justice.  It is only after he was confronted with documentary evidence of his deception with regards to the Iraqi national brothers did Divers attempt to destroy the paper trial of evidence of his wrongdoing located in his office desk drawer. Divers knew that he was under investigation because, on December 12, 2012, DHS-OIG agents advised Divers of his employee rights and then questioned Divers about his use of the Iraqi national brothers as registered confidential informants for whom Divers had obtained release and deferred action. Divers made a sworn statement at that time that their cooperation netted nothing and that they were subsequently determined to be unreliable. But although Divers

allowed the brothers remained in the country for over two years before the deferred action was withdrawn and they were deported from the United States, Divers told the agents, "at no time did I receive any money or benefits for assisting" the brothers.

Divers thought he was in the clear until several months after his interview with DHS-OIG, he was confronted by Agent AY, and after conducting an audit in his new position as ICE confidential Source Card Coordinator learned that Divers was reusing a unique official C/I number that had been assigned to one of the Iraqi brothers, Divers knew the gig was up.   Divers claimed to have turned the Source cards for the brothers in to Agent AY's predecessor, falsely accusing that predecessor to having lost the source cards.

 Within minutes of that confrontation, Divers, officemate, Agent PS  saw Divers going through his desk drawer and his file cabinet and retrieving a stack of documents.  Divers took the documents to the shredder and shred them.  Over the numerous years Agent PS had shared an office with Divers, she had never seen Divers clean or collect records in that manner.  She found his behavior so out of character that she contacted DHS-OIG to report what she had witnessed.

DHS-OIG successfully recovered the shredded documents and FBI lab successfully reassembled them.  They included the original and both copies of the one of the Iraqi national brothers' official ICE-HSI source card and several other

documents which further demonstrated Divers collusive relationship with Busse and Busse's clients.  Those documents included the official metroPCS subscriber report for the telephone number which one of the Iraqi nationals dialed on January 11, 2011 to reach "Tony,"  the alleged source of false identification document during the staged cooperation; an attachment to a Naturalization Application for Busse's client, KS; and, correspondence relating to a legal action against Divers in 46th District Court which was addressed to Divers' attorney, Charles Busse after Busse was able to obtain a full dismissal of that collection matter on Divers behalf. The dismissal of the debt collection action against Divers was obtained by Busse within in weeks of when Divers arranged for Busse's clients, the Iraqi national brothers to be released from immigration custody.

Under the ICE-HSI regulations, at the time, Divers was required to maintain the confidential source records in a locked safe in the Detroit field office for five years.  Thereafter the records were to be submitted to the National Records Center in Illinois where they were to be maintained for an additional 50 years. Divers reliance on Special Agent Darryl Pugh's statement that shredding a source card would not be problematic because headquarters would have a copy is also disingenuous.  Divers had retained all copies of the Iraqi national's source card before shredding them.

In addition, Divers was also required to disclose any conflicts of interest. Divers' destruction of official DHS documents and other documents showing his association with Busse and Busse's clients, which included himself, was for no other reason than to conceal his involvement in this case and hinder and obstruct any further investigation into his and Busse's criminal behavior. For these reasons, a two level increase under USSG § 3C1.1 is appropriate.

## B. **The Probation Department's Calculation**

The probation department has calculated the sentencing guidelines in this matter as a total offense level of 23 (PSR, ¶ 80). With a criminal history category of I, the Probation Department found that the advisory sentencing guideline range for defendant Divers is 46-57 months (PSR, ¶115). The probation department further rejected defendant's objections to the probation department applying increases provided in USSG §§ 2C1.1(b)(2) and 3C1.1 to determine his advisory guideline range.

With regards to USSG § 2C1.1(b)(2) the Probation Department relied on the rules of relevant conduct provided in USSG § 1B1.3(a) and more specifically, the guidance contained therein that "in the case of a jointly undertaken criminal activity (a criminal plan, scheme endeavor, or enterprise undertaken by the defendant in concert with, (whether or not charged with a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly

undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for the offense, or in the course of attempting to avoid detection or responsibility for that offense.

In support of applying the six level increase under USSG § 3C1.1, the Probation Department relied on Application Note 4  of USSG § 3C1.1, which provides examples of  "covered conduct" to include destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (i.e., **shredding a document** or destroying ledgers upon learning that an official investigation has commenced or is about to commence." (emphasis added by probation department).

In addition, to the legal authority on which the government relies in support of the level increases included here, the government adopts the guidance  provided in the Guidelines manual that the Probation Department used to apply the guideline level increases under §§ 2C1.1(b)(2) and 3C1.1 to determine Divers' advisory guideline range.

For all the reasons stated, the defendant's offense level should be determined at 18; with a six level adjustment under § 2B1.1(b)(2) for the more than $40,000 in legal fees Busse collected from his clients, which represents proceeds of the fraud in this case; and, a two level increase under § 3C1.1 for obstruction of justice for shredding official ICE-HSI documents and other documents material to this

investigation.  The adjusted offense level should therefore be 23.  The resulting guideline range is 46-57 months.

## IV.    Sentencing Factors

### A. The Nature and Circumstances of the Offense and Respect for the Law (18 U.S.C. § 3553(a)(1)

The highly sensitive nature of the position that Divers held with the Department of Homeland Security cannot be overstated.  To then use his position to repeatedly exploit one of the country's most sensitive immigration benefit programs makes this a very serious offense. In addition, allowing Busse to basically compromise the top secret clearance entrusted to Divers, intended to be used for the purpose of protecting the interests of the United States, through fraud and deceit is particularly egregious.  Divers' undeniable betrayal of his duty to the United States in order to satisfy the illegal objectives of one individual warrants a severe penalty.

### B. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)

As a result of the crimes he committed here, in January 2017, Divers resigned from his position as a special agent with ICE-HSI after having served in that capacity for 14 years.  He spent the last seven years of his service deceiving his colleagues, participating in a sham, and otherwise violating his oaths as an officer for the nation.

Were Divers not still operating in his web of deception, he would not make the representations he has made in his submissions to the U.S. Probation Department.  In them he claims, that he does not recall notifying the Chicago agent about alleged immigration fraud activities. Divers memory is presumably refreshed because with the copies of emails exchanges regarding this issue between Divers, Agent MF and Busse, as well as the transcript of Agent MF were provided to Divers in discovery.  Agent MF testified in the grand jury that Divers, in fact, contacted him over a weekend and represented that LS had information about an individual in Chicago who was engaged in immigration fraud. Agent MF continued to keep Divers abreast of his communications with Busse and later called Divers, as a "courtesy" to inform him that he looked into to the matter and could not find anything in any database on a name of an individual provided by Busse in early October 2014.

Only after it became clear to Divers and Busse that they would not be able to dupe the Chicago ICE HSI office into following their false information, Busse and Divers changed their approach to defrauding the U.S. Department of Homeland Security in Detroit. By October 9, 2014, Busse made LS aware of the change in the staged cooperation from Chicago to Detroit.  Busse told LS "in clearing the record  . . . in Chicago, um they weren't able to confirm a couple of details which they needed to confirm.  And so, uh, I on my own, gave some

consideration to the possibility of . . . perhaps arranging a hearing in Detroit

through my contacts here, who actually were the contacts that turned me onto

Chicago anyways." Later in the October 9, 2014 meeting, Busse made another

reference to his "contact" in Detroit and told LS "So I met with him and talked

about this information and he said that he would be reviewing it through his office

here and that if it was as good as it sounded, which it is, then we might even not

even have to go to Chicago, we could just do this here." Busse then cautioned LS

"because meetings with, you know, officers of immigration and officers of the

government and investigators, a lot of that's very sensitive . . . and as an attorney,

I'm a little reluctant just to even to let you know I know these people. You know

because sometimes they get in trouble because the word on the street . . . " LS

replied "Busse, I am not talking to anybody."

       Call record data indicated that 4 calls were placed and 7 texts were sent

between Busse and Clifton Divers on October 7, 2014. The same call data

indicated that an additional 4 calls were placed on October 7, 2014 between Busse

and Divers. And on the afternoon of October 10, 2014, when LS met with Busse

at his office at 811 South Boulevard E, Suite 200, Rochester, Michigan, Busse

stated at the outset of that meeting: "Um, well okay. We're doing it here. We're

doing it in Detroit." Later in the meeting, Busse explained: "the Detroit people

who um, are interested in what's happening here um, have agreed to basically work

with Chicago but take, take over going forth allowing us to meet people here."

Busse also informed LS "the new part of the story is that our fellow is also

involved in transportation of drugs and so um, some of that moves through Detroit

and New York, um, so our story expands a little bit. Telephone call records also

confirmed that on October 10, 2014 at 4:41 p.m. a call was placed between Busse

and Divers that lasted approximately 7.5 minutes. LS's meeting with Busse on that

same day began approximately 40 minutes after that call.

This would follow the same pattern that Busse and Divers used with Busse's

client, KS—start with a referral to Chicago Agent MF as reflected in Busse's daily

planner and when that doesn't work, end up with sham cooperation in Detroit.

This is just one example of the overwhelming evidence that refutes Divers claims

and the several other incredible representations he makes in his submissions to the

Probation Department.  Particularly, Divers alleged reasoning for deceiving his

fellow agents and submitting falsified official DHS documents about the identity of

Busse as LS's attorney because he did not want "personality conflicts" between

agents and Busse to impede the potential for garnering inside information is risible.

What Divers really means is that he would violate his oath for truthfulness to

achieve the goals of a corrupt lawyer who he was helping carry out an illicit plan

against the United States.

Divers empowered Busse. His assistance allowed Busse to guarantee results for his clients that would otherwise amount to herculean efforts by lawyers legitimately pursuing relief for clients in similar situations.  That's because Busse had someone other immigration lawyers didn't have. Busse had Divers and their partnership would prove invaluable.  "We're partners, kiddo, we're partners; "he'll always protect you," Busse told LS, during recorded conversations with Busse. And the evidence discovered in this case would bear out that truth.

Divers' deceit and fraudulent seemed boundless. He engaged in numerous corrupt actions to advance this nefarious scheme.  In addition to the cases outlined here, Busse's daily planner includes names of approximately 31 additional illegal aliens who Busse had listed on various dates with Divers name.  A review of phone records revealed on each day on which Busse's calendar reflected the name of an alien along with Divers' name, Divers and Busse communicated by phone on the date of meeting or the days surrounding the date of the meeting every single time, sometimes talking two to three times in one day.

Much like his "partner," Busse, Divers' astonishing claims suggest that Divers has not actually accepted responsibility for his extensive crimes to which he admitted under oath during his plea colloquy and in the factual basis of Rule 11 Agreement as being accurate.  Even his submissions about challenges he faced in his personal life with his wife and his father are grossly inaccurate and misleading.

It also suggests, like Busse during his sentencing, Divers continues to make representations during official proceedings with little, if any disregard for the truth.

### C. <u>Deterring the Criminal Conduct of Others</u>
   **(18 U.S.C. § 3553(a)(2)(B))**

Divers abused the trust of the nation in failing to carry out his duties with honesty, integrity and professionalism.  The spectacle of a federal agent entrusted with the highest authority to do good and protect this nation from harm, who, rather than fulfill his duty, advances the illegal interest of a shifty lawyer and protects him from investigation and detection damages the faith of the citizens in the integrity and the fairness of their system of government.  Given these circumstances, principles of general deterrence and respect for the law support the imposition of a substantial sentence is appropriate.  Anything less than a significant prison sentence would send the message that this conduct is tolerable. It is not.

### D. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>
   **(18 U.S.C. § 3553(a)(6))**

Finally, imposition of a sentence within the advisory Guideline range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Congress "sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct" prior to the Guidelines. *Rita v. United States*, 127 S. Ct. 2456, 2464

(2007).  Because "uniformity remains an important goal of sentencing," "Section

3553(a)(6) directs district courts to consider the need to avoid unwarranted

disparities." *Kimbrough v. United States*, 128 S. Ct. 558, 573-74 (2007)(emphasis

by Court).  The Guidelines "help to 'avoid excessive sentencing disparities,'"

*Kimbrough*, 128 S. Ct. at 573-74, because "avoidance of unwarranted disparities

was clearly considered by the Sentencing Commission when setting the Guidelines

ranges," *Gall v. United States*,128 S. Ct. 586, 599 (2007), and because most

defendants are sentenced within the Guideline Ranges.

A sentence within the guideline range would serve this purpose in this case.

This Court sentenced Busse at the top of his advisory guideline range at 37 months.

Based on his position of trust, Divers responsibility in this matter is qualitatively

even different from Busse's former position as an officer of the Court.   Moreover,

Divers potentially exposed other law abiding ICE agents to unwarranted legal

scrutiny through his actions.  A substantially higher sentence for Divers is fully

appropriate here.

Accordingly, an individualized consideration of Divers should result in a

substantially higher sentence than that imposed on his codefendant. He has

advanced no valid reason why this court should vary from the guideline range of

46-57 months.

## V. <u>CONCLUSION</u>

Divers' reprehensible conduct in this case casts an even bigger cloud over the already overtaxed and broken system and the men and women who dutifully perform its mission honorably.  Given the numerous instances of fraud and deception that Divers and Busse employed to commit these crimes, not only at the expense of the United States and Divers' fellow agents, but also to the detriment of the inexperienced, desperate clients Busse exploited, any sentence should reflect the serious crime Divers committed.

For all the reasons stated, as well as the sentencing guidelines and the statutory factors set forth in Title 18 United States Code, Section 3553(a), a sentence of 52 months in prison is appropriate in this case.  Such sentence would be sufficient but not greater than necessary to satisfy the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney


*s/Dawn N. Ison*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3211
dawn.ison@usdoj.gov
(313) 226-9567

Dated:   August 8, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filings to the following:

*Arthur J. Weiss, Esq.*
*Attorney for Clifton Divers*

s/DAWN N. ISON_____
DAWN N. ISON
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9567
Email: dawn.ison@usdoj.gov

Dated: August 8, 2018